GILPIN, The JOHN. See Cases Nos. 7,343–7,345.

---

## Case No. 5,452.

### GILPINS v. CONSEQUA.

[Pet. C. C. 85;[1] 3 Wash. C. C. 184.]

Circuit Court, D. Pennsylvania. April Term, 1813.

CONTRACTS—PAROL EVIDENCE—FRAUD—ACCOUNT OF SALES—CUMULATIVE EVIDENCE AFTER CLOSING OF TESTIMONY—EXCUSE FOR NONPERFORMANCE—SEASON OF YEAR.

1. Action for damages, for not delivering teas, according to a written contract, entered into at Canton, between the supercargo of an American ship, owned by the plaintiffs, and the defendant, a Hong merchant of Canton.

[See Fisher v. Consequa, Case No. 4,816.]

2. When a contract is in writing, conversations previous to and leading to it, cannot be given in evidence.

[Cited in Phillips v. Preston, 5 How. (46 U. S.) 291.]

[Cited in Rearick v. Rearick, 15 Pa. St. 72.]

3. Evidence to prove fraud, by showing it was in the power of the defendant to have changed the teas, after they had been examined by the plaintiffs' agent, is inadmissible; the contract of the defendant having stipulated, that the teas of the best quality should be delivered, on board the plaintiffs' ship.

4. An account sales of the entire cargo, cannot be given in evidence by the defendant, when the interest of the party against whom

it is offered was separate and not joint, and when the defendant does not intend to impeach the separate account of sales of the plaintiffs' interest in the property sold.

[Cited in Gordon v. Bowers, 16 Pa. St. 228.]

5. After the defendant has closed his testimony, the plaintiffs will not be permitted to give additional evidence on a point, upon which they had already examined witnesses, and on which nothing new had been proved by the defendant.

6. Evidence to explain a transaction which had come out from the defendant's testimony, was allowed; and the plaintiffs were suffered, after their testimony in chief was closed, to examine witnesses to repel an argument, which might be drawn from the statements of the defendant's witnesses.

7. The examinations of the supercargoes of the muster chests, and their letters to the plaintiffs, expressing their satisfaction with the qualities of the teas, are not conclusive evidence of their quality, if in fact the teas were not of the quality represented.

[Cited in Port Carbon Iron Co. v. Groves, 68 Pa. St. 150.]

8. It is no excuse for the non-performance of a contract to deliver "prime" "first chop" teas, that the season of the year, when the teas were to have been delivered, was unfavourable to the best teas being at market.

[Cited in Peoria Marine & Fire Ins. Co. v. Walser, 22 Ind. 85.]

9. What is the proper test of the quality of teas, part of which were sold in Philadelphia, and part at the sales of the Dutch East India Company at Amsterdam.

10. Quere. Whether the quality of the teas should be ascertained, by comparing them with the highest prices for which other teas were sold at Amsterdam at the same time, or with an average of the prices; or what rule should be adopted?

11. The sales, at Amsterdam, of teas of prime quality, compared with the sales of the plaintiffs' teas, furnish the rate of loss, which is to be applied to the first cost in Canton; but these sales do not furnish the amount of loss.

[Cited in Youqua v. Nixon, Case No. 18,189; Cheongwo v. Jones, Id. 2,638.]

12. No damages are to be allowed, for any profit or gain the plaintiff might have obtained, by exchange or otherwise.

[Cited in Chicago & Rock Island R. Co. v. Ward, 16 Ill. 527; Ward v. Burr, 5 Blackf. 117; Adams Express Co. v. Egbert, 36 Pa. St. 363; Morey v. King, 49 Vt. 308; McAlpin v. Lee, 12 Conn. 133; Harbold v. Kuster, 44 Pa. St. 394.]

13. Interest on unliquidated damages is not allowed.

[Cited in Barrow v. Reab, 9 How. (48 U. S.) 371; Lincoln v. Claflin, 7 Wall. (74 U. S.) 135; Eddy v. Lafayette, 49 Fed. 813.]

[Cited in Moulton v. Scruton, 39 Me. 291; Gear v. Shaw, 1 Pin. 616.]

14. If the cross interrogatories are not put to a witness, examined under a commission, the deposition of the witness cannot be read.

15. It is no objection to a deposition, that it is in English, and commissioners before whom it was taken were Dutchmen, and do not state that they had the assistance of a sworn interpreter. Nor is it an objection, that the cross interrogatories were not put to each witness, immediately after he had answered the chief interrogatories, but were put to him after all the chief interrogatories were answered by all the witnesses; nor is the commission defective, because the commissioners and their clerk were not sworn.

---

1 [Reported by Richard Peters, Jr., Esq.]

16. Those who execute a commission are appointed by the court, and although they may be nominated by the parties, they are not their agents.

[Cited in Jones v. Oregon Cent. Ry. Co., Case No. 7,486.]

This was action on the case, on a contract made between the supercargo of the plaintiffs, merchants of Philadelphia, with the defendant, who was a Hong merchant in Canton; in writing, but not under seal; whereby the defendant agreed to deliver to the supercargo, Redwood Fisher, a cargo of tea, for the Pennsylvania Packet, at certain prices, fixed in the contracts; the same to be fresh, prime, and of the first chop. The breach laid in the declaration was, that the teas were not of the quality stated in the contract, but were very inferior, &c. Plea non assumpsit.

The plaintiffs proved; that the Pennsylvania Packet was loaded for Canton in 1805, with about eighty thousand dollars specie, whereof one half was shipped by the plaintiffs, on their own account, one fourth by Dunant, and one fourth by Joshua Fisher; and also that she had on board, about fourteen thousand dollars worth of ginsang. Redwood Fisher and James Reed, were constituted the supercargoes; and a letter of instructions given to them by the shippers, stating their separate interest, and that the teas to be purchased were to be marked with the names of the respective shippers, according to their interests as above mentioned. Mr. Redwood Fisher gave evidence, that upon his arrival at Canton he secured the ship with the defendant, and entered into the contract stated in the declaration.

The defendant's counsel objected to evidence being given of any conversations with the defendant, leading to the contract, and tending to explain and in any wise to vary it. 5 Bin. 517; 1 Johns. 414, 453; 5 Johns. 138; 2 Caines, 155; 5 Bos. & P. 270; 12 East, 6.

BY THE COURT. Evidence to explain or vary the contract is improper; all conversations leading to the contract are merged in it; and if the evidence offered to be given, be only to confirm the contract as stated by plaintiffs' counsel, then it is improper, because unnecessary; the defendant not meaning, as his counsel declares, to impeach it.

The delivery of the teas and the payment for them were fully proved. The cargo was brought to Philadelphia, in August, 1806, in good order; and (except about two hundred and sixteen boxes which were sold) remained in store till March, 1807; when it was sent to Amsterdam, consigned to Hope and Co., who placed it in the warehouse of the East India Company, who have the exclusive privilege of selling teas there. These teas, amongst others in the possession of this company, were sold at public sales, according to the usage, part in August, 1807, and the residue in July, 1808; of which sales, printed copies were made out of the whole sales, as is usual, and forwarded to the plaintiffs. From a comparison of these sales it appeared, that the plaintiffs' teas sold for less than some other teas of the same kind, which one of the witnesses attributed to their being of inferior quality.

The plaintiffs offered in evidence, certain depositions taken under a commission to Amsterdam, which were objected to, for the following reasons: 1st. One of the depositions was taken upon the direct interrogatories of the plaintiffs, but the cross interrogatories were not put to the witness. 2d. The depositions are written in English, though the commissioners are Dutchmen, and it does not appear that there was a sworn interpreter. 3d. The cross interrogatories are not put to each witness, after he has answered the direct interrogatories, but after they have been answered by all the witnesses. 4th. The commissioners and the clerk were not sworn. In answer to the first objection it was said, that the omission to put the cross interrogatories was the fault of the defendant's commissioner, or agent; and therefore ought not to affect the deposition.

BY THE COURT. It is a great mistake to call the commissioner appointed by the defendant his agent; he is appointed by the court, though nominated by the party, and is no more the agent of the party nominating him, than an arbitrator is the agent of the party who chose him. The particular deposition objected to, because the cross interrogatories were not put, cannot be read; that objection does not apply to the other depositions taken under the commission. There is not the slightest weight in any other of the objections to this commission.

The plaintiffs having offered evidence, calculated to show, that after the examination made in Canton, by the purchasers of teas, they may be changed, and teas of a different quality imposed upon them, THE COURT stated, that this action being upon the contract, no evidence ought to be given calculated to impute fraud to the defendant. It is not sufficient for the defendant to show, that the teas which were examined by the supercargo, answered the description in the contract, if those which were delivered on board did not. He was bound to deliver them of that quality on board, unless the supercargo received them on shore at his risk.

On the part of the defendant it was proved; that the usage in Canton was, for the American merchants to secure with one of the Hong merchants. That one chest, called the muster chest, out of each chop (consisting of a great number of chests of each quality), was sent to the factory, or residence of the purchaser, for his examination. If, after trying it himself and taking the advice of others, on whose judgment he relies, he approves, the whole quantity purchased is sent to the weigh-house, where the chests are

weighed and marked anew; generally the next day, they are sent down, in one of the Hong boats, to Wampoo, about twelve miles from Canton, where the ship is moored. That the purchaser may, if he pleases, examine every chest of tea, though this is unusual; and he may, if he pleases, remain with the tea, after it is weighed, and accompany it to the ship. That the superior teas, are to be purchased from September to middle of December, and those afterwards purchased are inferior; the best having been selected before January.

The defendant offered in evidence, a paper sent to Joshua Fisher, one of the shippers, and delivered to the defendant by Fisher's executor, containing an account of the sales of the whole cargo of teas sent to Amsterdam, signed by Hope and Co.

BY THE COURT. Fisher, Dunant, and the plaintiffs, were separate, and not joint owners of this cargo; and it is therefore improper to give in evidence in this cause, an account of the sales of the entire cargo sent to Mr. Fisher; the defendant acknowledging, at the time he offers it, that he does not mean to impeach the account of sales from Hope and Co. which has been given in evidence by the plaintiffs.

After the defendant had closed his opening, the plaintiffs offered to examine witnesses, as to the custom spoken of by the defendant's witnesses, in relation to purchasing of tea at Canton.

BY THE COURT. In your opening you examined witnesses on this subject; and as nothing new in relation to it, has been given in evidence, it would be improper for the plaintiffs again to examine witnesses respecting it.

The counsel moved, that they might examine the supercargo, to explain a transaction, which had come out on the defendant's testimony, respecting ginsang, which had been smuggled on shore from the Pennsylvania Packet; and also to repel an argument which the defendant's testimony would authorize, that it was the duty of the plaintiffs' supercargo, to have examined for himself, all the teas; and that it was to be presumed, either that he had done so, and was satisfied; or, that having neglected to do so, the defendant was not liable. It was intended to be proved, that the defendant told the supercargo he need not examine the teas, as he the defendant was bound by his contract to deliver him good teas.

BY THE COURT. As to the affair of the ginsang, the plaintiffs have certainly a right to examine witnesses to explain it. They may also repel any argument, to be drawn from the evidence given by the defendant, that the plaintiffs' supercargoes, either examined the teas and were satisfied with them, or that they might have done so, and were therefore guilty of a faulty negligence in not doing so. The evidence offered to be given is, in this point of view, proper.

The plaintiffs contended, in their summing up, that the inferiority of the prices, which these teas commanded at the Amsterdam market, to other teas of the same denomination, was conclusive proof, that they were not prime, and of the first chop, as stipulated by the contract: and, that in ascertaining the quality of these teas, by comparing the prices at which they sold, with most of other teas of the same denomination, the comparison ought to be made, with those boxes which sold for the highest prices, and not with the average of the whole quantity, say five thousand chests, out of which those few chests were selected; and, that in estimating the damages, the plaintiffs were entitled to the difference, between the sale of their teas, and such highest priced teas; together with the gain by exchange, which they would have made upon such difference, had they received it; and also interest upon the whole.

The defendant insisted, that the supercargoes were satisfied with the teas, and so expressed themselves, to their owners; which, under the fair construction of the contract, had excluded any claim by the plaintiffs upon the subject of quality. That this vessel having arrived at Canton, out of the season for the best teas, the contract ought to be construed in reference to that circumstance; so as to mean such prime, first chop teas, as were to be obtained at that time. They insisted, that the sales of a part of the cargo at Philadelphia, with which the plaintiffs were satisfied, because no claim is made on account of that quality, is conclusive as to the quality of the whole cargo; which the sales at Amsterdam cannot effect. But at all events, the sales of the plaintiffs' teas at Amsterdam, should be compared with the average price of the whole of each denomination; in which case, it would appear, that the plaintiffs had not a pretence of claim; and also that their claim was unfounded, since it appears that they had made a considerable profit upon the whole voyage.

WASHINGTON, Circuit Justice (charging jury). The contract upon which this action is founded, obliges the defendant to deliver to the plaintiffs' supercargo, a certain quantity of teas, of different kinds, at stipulated prices; the same to be fresh, prime, and of the first chop, to their entire satisfaction. The true meaning of the words "prime," "first chop" (the latter of which seems to have been imported from the East into the mercantile language of this country), of course is familiar to a jury of merchants, and can be better understood by them, than by the court. This being done, it is then admitted by the defendant's counsel, that Consequa was bound to deliver teas of the described quality; but they contend, first, that if the supercargoes were satisfied (which they expressed themselves in their letters to the plaintiffs to be, by stating that the cargo

was composed of teas of the first quality) that the plaintiffs cannot afterwards object to the quality, in an action upon the contract; secondly, that these words as descriptive of the quality, should be construed in reference to the season of the year, and the state of the market. The court cannot sanction either of these arguments. As to the first, it is most obvious, from the usage of this trade at Canton, as given in evidence, the purchaser never examines all the teas, with which he is to be furnished, and seldom more than the muster chest, which is sent to him for that purpose; relying upon one of the Hong merchants, that the quality of the entire parcel of each denomination, will correspond with the sample sent. Besides, if the satisfaction of the purchaser, either expressed or implied, can dispense with the necessity of the tea answering the quality stipulated in the contract; his dissatisfaction, however capricious and unreasonable, might prevent the seller from fulfilling his contract. The real meaning of the contract is, that the teas shall be of the agreed quality, such as the purchaser ought upon examination to be satisfied with. The declarations of the supercargoes, that the cargo was of the first quality, made as they were in this case, without examination; could only have been upon the faith of the contract, and the honour and judgment of the defendant. Second, the quality of the teas, engaged to be delivered, should certainly be considered in reference to the general market of Canton, so as to preclude a construction which would compel the defendant to deliver teas, not usually brought there for exportation. But, if the advanced season of the market, should be admitted to control the general and strong expressions of the contract, it would be difficult to know where to stop; such a construction might sanction the delivery of inferior teas, in the face of a contract, which stipulates for those of prime quality. The defendant ought to have known, whether from this or any other circumstance, he could or could not comply strictly, with his engagements; and, consequently, he ought, in the latter case, to have qualified the expressions used. The true meaning of the contract being ascertained, the next question is, whether it has been broken?

There were two modes by which the quality of these teas could be tested: Examination by competent judges, and comparison of the prices given for these teas, by persons after examination with other teas, of the same denomination, sold at the same time, and under the same circumstances. The plaintiffs rely upon the latter, and generally speaking it may furnish a tolerably just criterion of value, though not always to be relied upon. That sales at auction, are not always a decided test of quality, common experience has proved. It sometimes happens, that a difference takes place where the quality is precisely the same, arising from the various motives which actuate those who bid. If the age of the tea contributes to its deterioration, that would be another reason, why the comparison might not be infallible. In this case, as the first sale at Amsterdam was one and a half, and the second two and a half years after they were purchased; whether the teas in question were affected in quality by this cause, by sea injury or otherwise, you must decide.

The defendant however contends, that the sales at Philadelphia, ought to be considered as conclusive of the quality of these teas; and certainly this argument is entitled to the serious consideration of the jury. The unexceptionable quality of one sixth of the cargo, taken out indiscriminately from the whole, and sold; and of course examined and approved of by the different purchasers; affords strong evidence of the good quality of the whole cargo, before it left Philadelphia; and if you should be of this opinion, the case is clearly in favour of the defendant.

But if you should prefer the test contended for by the plaintiffs, then another question arises:—Ought the sales of these teas, to be compared with those of the highest sales of other teas, of correspondent denominations, or with the average of those sales? The plaintiffs contend for the former, and the defendant for the latter. The court is of opinion that both are wrong. The plaintiffs are so, unless they first prove that the comparison of one thing to another, by auction prices, is an unvarying test of quality, which it certainly is not. The defendant's rule is also wrong; because it would result, in comparing teas which ought to be of the first quality, with those of inferior teas, so far as inferior teas compose the quantity from which the average is taken; and such teas must necessarily form a part of the average, if price be the test of quality. Some rule between these extremes may be more likely to meet the justice of the case, which the jury may probably devise.

Supposing that the jury shall have settled all these points to their satisfaction, that is, that this contract has been fulfilled as proved by the sales at Philadephia, or not fulfilled, as proved by the Amsterdam sales; and in this latter case, that the teas in question ought to be compared with the highest sales or with the average price, or with some price between these extremes; the important question remains, What ought to be the rule by which damages should be assessed? The plaintiffs claim the difference between the prices of their teas, and the highest sales of other teas, at the same time. Besides the objection to this mode before noticed, there is another, which is, that this would be to subject the defendant to the casualties of a foreign market, with which he has nothing to do. The decisions upon this point in cases of insurance, have a

strong bearing on the question. In those cases the insured, if the foreign market be high, may with at least a semblance of reason say to the underwriter, "You promised to indemnify me against all loss arising from certain risks in this voyage, and my loss is precisely the amount for which the cargo would have sold, had it arrived safe;" and the underwriter might use the same language, in case the market was low. Yet the decisions are, that the underwriter is not to be governed by the foreign market. But in this case, the contract of the defendant was merely to deliver, at Canton, teas of a certain quality. It was nothing to him what the plaintiffs did with them, at what market, or at what time they might choose to sell them. It would be most unreasonable, to hold the defendant bound to make up losses, which might arise out of the speculations or miscalculations of the plaintiffs, to which he was not privy and in no respect consented. If a man contract to deliver a quantity of flour, for instance, by a particular day, and fails; or deliver it of a quality inferior to that stipulated for; all that can be claimed from him in the first case, is the price of such flour, at the time and place when and where it was to have been delivered; or in the second, to make up the difference in the quality. He would never be permitted to resort to a foreign market, to which he might have carried it, to fix the standard of his loss. Upon this principle therefore, the jury will consider the sales at Amsterdam, and the comparison of them with those of other teas, not as furnishing the amount but the rate of loss;—and having ascertained that, whether it be five, or be ten, or any other rate per cent.; then to apply that rate to the prices of the same articles of first quality at Canton, when these teas were delivered; of which, in the absence of other evidence, the prices agreed upon in this contract may be taken. The result of this operation will furnish the proper rule of damages, should you give any.

The claim of the plaintiffs, for the supposed loss of what they might have gained by the difference of exchange, upon the amount to which you may think them entitled, is too extravagant to be treated seriously. They might as well claim all the profit, which might have been made by investing that money in a cargo of goods in England, and then selling them in the United States, and so on. As to interest, this is a question generally in the discretion of a jury. But it is not agreeable to legal principles, to allow interest on unliquidated and contested claims, sounding so much in damages.

The jury found a verdict for five thousand five hundred and fifty-six dollars: the claim of the plaintiffs was upwards of twenty-two thousand dollars.